## SHARP *v.* FITZHUGH.

Opinion delivered May 27, 1905.

1. BANKRUPTCY—POWERS OF TRUSTEE.—Under the Bankruptcy Act of 1898, § 70, subdivision e, a trustee in bankruptcy is clothed with plenary power to sue to avoid any transfer by the bankrupt of his property which any creditor may have avoided, whether made within four months prior to the adjudication of bankruptcy or not. (Page 565.)

2. CONVEYANCE OF HOMESTEAD TO WIFE—RENTS AND PROFITS.—As the creditors of a bankrupt cannot complain that he has conveyed his homestead to his wife, it follows, from her ownership thereof, that she is entitled also to the rents and profits derived therefrom. (Page 566.)

3. FRAUD—HUSBAND IMPROVING WIFE'S PROPERTY.—While creditors may follow and subject to the payment of their debts money and materials furnished by their debtor in permanently improving his wife's property, such property is not liable to the husband's creditors for augmentation of the rents and profits or enhancement of value on account of any reasonable contribution of his time, labor or skill in the management of the property. (Page 567.)

4. MARRIED WOMAN—PURCHASE BY HUSBAND IN HER NAME.—Where a married woman, having no source of income save the rents from a farm, permitted her husband to receive and use the rents, which he mingled with his own funds, she will, in the case of subsequent purchases made by him and taken in her name, be held to a strict showing, as against his creditors, that these purchases were made from her rents. (Page 569.)

Appeal from Crawford Chancery Court.

J. VIRGIL BOURLAND, Chancellor.

Affirmed.

### STATEMENT BY THE COURT.

This is a suit brought in the chancery court of Crawford County by H. L. Fitzhugh, as trustee of the estate of John Sharp, a bankrupt, against said John Sharp and his wife, Ella Sharp, and others, to subject certain property, real and personal, held in the name of Ella Sharp, to the payment of the debts of said bankrupt.

John Sharp, prior to the year 1897, failed in business, and was indebted to creditors in large sums, which he did not pay. In April 29, 1902, he filed his petition in bankruptcy, and was duly adjudged a bankrupt, and appellee, H. L. Fitzhugh, was by the creditors elected as trustee of the estate of the bankrupt. This suit was brought by said trustee for the benefit of the creditors of the estate who had proved their claims, by direction of the bankruptcy court. It is alleged that John Sharp, while insolvent and with fraudulent intent to cheat, hinder and delay his creditors, purchased in the name of his wife, Ella Sharp, the following land, viz., eighty acres of land, bought from the Union Central Life Insurance Company, designated in the proof as the "homestead tract;" forty acres, bought from H. H. Hilton, trustee, for the sum of $200, known as the "Hilton forty;" one lot in the town of Alma, bought from Hillyer and others for the sum of $200; another lot in the town of Alma, bought from Sam B. Locke, guardian, for the sum of $300; another lot in the town of Alma, bought from Jones and others for the sum of $300, and 782 acres, known as the "G. N. Wright farm," bought from the Union Central Life Insurance Company for the sum of $12,000, of which the sum of $1,000 was paid cash, the remainder on credit of ten years, with six per cent. interest, payable annually. It is further alleged that said bankrupt is the owner of the following personal property held in his wife's name, towit: $3,500 invested as partners in a mercantile business conducted in the town of Alma with defendant, Frank Wright, under the firm name of Wright & Co.; $750 invested in the capital stock of a sawmill company in Oklahoma Territory, and a note of defendant C. C. Montague for the sum of $250, executed to Ella Sharp in settlement of the purchase price of a pair of mules and a wagon and lot of corn sold to Montague. That said bankrupt was and is the real owner of said property, and placed the same in the name of his wife, the said Ella Sharp, for the purpose of defrauding his creditors.

The defendants, John Sharp and Ella Sharp, filed their joint answer, denying that any of the property described was owned by John Sharp, or that title was taken in the name of Ella Sharp for the purpose of defrauding his creditors, and alleging that

all of it was the separate property of Ella Sharp, and was bought with her money, except the homestead eighty, which was conveyed to her by the Union Central Life Insurance Company in consideration of her joining her husband in a conveyance to said company of her dower in the equity of redemption of a farm, known as the "Sharp place," upon which the company held a mortgage.

Mrs. Sharp also filed a separate supplemental answer, claiming the homestead eighty and the Hilton forty as her homestead. The chancellor, in the final decree, dismissed the complaint as to this property, and declared the same to be her homestead, and no appeal from that part of the decree was taken by the plaintiff.

The Union Central Life Insurance Company and C. C. Montague were made defendants, and served with process, but failed to appear.

The court rendered a decree in favor of the plaintiff, except as to the 120 acres held to be the homestead of the defendants, and cancelled the legal title to Mrs. Sharp thereto, and declared the same to be assets of said bankrupt estate in the hands of the trustee, subject, however, to the lien of the Union Central Life Insurance Company on the Wright farm for $11,000, balance of the purchase price.

The defendants John Sharp and Ella Sharp appealed to this court; John Sharp died pending the appeal, and upon suggestion of his death the cause as to him was abated.

*J. E. London* and *W. S. McCain*, for appellant.

No part of the debtor's labor should go to his creditors. 55 S. W. 441; 23 Wis. 301; 33 Vt. 459; 25 Mich. 200; 40 S. W. 382; 67 Ark. 110. An insolvent may take property subject to execution, and invest it into a homestead that is exempt. Thompson, Homestead, § 305; 39 Ark. 571. An interest in land by merely paying off purchase money notes cannot be acquired. 29 Ark. 612; 30 Ark. 66; 40 Ark. 62. Where a husband uses his wife's money, he may afterward invest a like amount in her name. 34 S. W. 652; 52 Ark. 234; 81 Wis. 151; 39 Minn.

242; 28 Ark. 351; 21 Ark. 268; 58 Ark. 20; 34 N. Y. 297; 55 Pa. St. 437; 54 N. J. Eq. 702; 37 W. Va. 242. The appellee was guilty of laches. 34 Ark. 467; 55 Ark. 94; 168 U. S. 696.

*Jesse Turner, Sam R. Chew, Henry L. Fitzhugh* and *Ben L. Moore,* for appellee.

Any conveyance made by Sharp, who was insolvent, is void as to creditors. 50 Ark. 42; 48 Ark. 419; 46 Ark. 542; 45 Ark. 520; 10 Ark. 225; 22 Ark. 145; 23 Ark. 494; 32 Ark. 251, 465; 52 Ark. 493; 20 S. W. 807; 13 S. W. 478; 43 Fed. 702; 71 Ark. 611; 83 S. W. 913. Both good faith and a valuable consideration are necessary to make the conveyances valid. Bisp. Eq. 305. The burden was upon Mrs. Sharp. 46 Ark. 542; 94 U. S. 580; 21 Pa. St. 355; 14 Am. & Eng. Enc. 489; 68 Ark. 166; 29 W. Va. 441; 6 Am. St. 664. Fuller and clearer evidence is required than if the parties were strangers. 39 Fed. 665; 84 Ala. 271; 106 Ala. 411; 37 Fla. 78; 35 W. Va. 754. The transactions will be presumed fraudulent. 83 S. W. 913; 45 Ark. 520; Wait, Fraud. Con. 300-308; 94 U. S. 580. A husband cannot devote his time and skill to his wife's property without making the proceeds subject to the payment of his debts. 26 L. R. A. 537; 94 Am. Dec. 478; 100 Am. Dec. 260; 36 Ark. 525; Pom. Eq. Jur. § 1103; 68 Md. 540; 50 Ark. 42; 19 Oh. St. 509; Kirby's Dig. § 5226. Where there is fraud, time will not run against the fraud until after its discovery. 61 Ark. 527. If Mrs. Sharp had any claim at all, she could only subject the land to the payment of her claim as a creditor. 46 Ark. 542 Bisp. Eq. § 243.

McCULLOCH, J., (after stating the facts.) 1. Appellants raise here, for the first time, a question as to the power of the trustee to maintain this suit, urging that he is empowered to sue to set aside only such conveyances in fraud of creditors as were made within four months next before the adjudication of bankruptcy. It is doubted that this question, though it goes to the power of the trustee to maintain the suit, can be raised here in the case, when no such objection was made below, either by demurrer or answer. It seems clear, however, that under subdivision e, section 70, of the Bankruptcy Act of 1898, the trustee is clothed with plenary power to sue to avoid any transfer

made by the bankrupt of his property which any creditor may have avoided, whether made within four months prior to the adjudication of bankruptcy or not. Collier on Bankruptcy (4th Ed.), p. 523; Brandenburg on Bankruptcy (3d Ed.), p. 438; In re *Gray,* 3 Am. Bankruptcy Reports, 647, 47 N. Y. App. Div. 554.

2. It appears from the evidence in this case that in the beginning of the year 1897 appellants, John Sharp and his wife, Mrs. Ella Sharp, were practically without any property except the homestead, eighty acres of which the Union Central Life Insurance Company had, the preceding year, bargained to Mrs. Sharp, and which that company conveyed to her the next year. They were then occupying this tract as a homestead, and on January 29, 1897, bought the Hilton forty-acre tract, adjoining the homestead. The large farm formerly owned by John Sharp had been taken under a mortgage held by the insurance company.

The G. H. Wright farm, which is in controversy, it appears, was formerly the property of Mrs. Sharp's father, and was then owned by the Union Central Life Insurance Company. During that year Mrs. Sharp obtained a judgment against said company for recovery of about $1,000 upon some liability, the character of which is not disclosed in this record, but which is conceded to be disconnected from the subject-matter of this controversy. She realized out of this judgment only the sum of $465, the remainder going to the attorney who conducted that litigation for her, as contingent fee. In December of that year (1897) the insurance company bargained the Wright farm to Mrs. Sharp for the sum of $12,000, of which $1,000 was paid cash, and the remaining sum of $11,000 was agreed to be paid in ten years from date with interest at the rate of six per cent. per annum, payable annually. The interest has been paid regularly; the principal is not due, and remains unpaid. It is shown by the testimony of Mrs. Sharp and of the agent for the insurance company, who is now one of the attorneys for appellant in this case, that this bargain was made personally by Mrs. Sharp and the agent, and that she made the payment of $1,000 by satisfaction of her part ($465) of said judgment, and the remain-

der, $535, in cash. John Sharp and Mrs. Sharp testify that the $535 paid in cash were realized from the crops raised on the homestead eighty and the Hilton forty during the year 1897, which belonged to Mrs. Sharp, and this is uncontradicted, save as to some contradictory evidence as to the amount of crops raised by the tenants on the place. Notwithstanding this contradiction, we think it satisfactorily appears by the proof that the payment was made with funds realized from crops raised on that place, which belonged to Mrs. Sharp, as rents and profits of the homestead which had been conveyed to her. The creditors could not complain of the conveyance to her of the homestead, even if bought by the husband with his own funds (*Wilks* v. *Vaughan,* 73 Ark. 174, and cases cited) ; and it follows that, if the legal title to the homestead was rightfully in her, she was entitled to the rents and profits thereof. To deny her the rents and profits of the homestead would be to deny her the use of the property itself.

The contract for the sale of the Wright farm to Mrs. Sharp by the insurance company is not in the record; but it is shown to have been in writing, and that by its terms the company agreed to convey the lands to Mrs. Sharp upon payment of the balance of the purchase price. It is further shown that John Sharp also signed the contract, or indorsed his name on the back of it.

John Sharp rented from the insurance company for the year 1898, and subsequent years up to the time of the trial of this case below, for an annual rental of $1,200, the farm known as the "Sharp place," which he had formerly owned. This place contained from 100 to 200 acres more cleared land than the Wright place. Both places were operated from year to year by John Sharp, and it is not shown with accuracy the amount of crops raised on each place, though Sharp undertakes to state the number of bales of cotton raised on the Wright place each year. We think that it appears with reasonable certainty that a sufficient amount was realized from year to year from rents and profits of the Wright place and the homestead, including the Hilton tract, to meet the annual interest payment of $660 and taxes and repairs. The only contribution, therefore, which

has been made by John Sharp toward the purchase of the Wright place was his judgment and experience as a farmer and his time devoted to the management. It is shown that he managed the place, rented it, and collected rents, directed the making of repairs, etc., and the operation generally of the farm, the same as he did the Sharp place, which he had rented. He says that his attention to the Wright place occupied about one-fourth of his time. Mrs. Sharp is a woman of no business ability or experience, and gave no time or attention to the operation of the farms.

This court, in *Morris* v. *Fletcher,* 67 Ark. 105, held that the creditors of the husband could follow and subject to the payment of their debts money and the value of material furnished by him in improving his wife's property, but said that "under no circumstances can the husband's creditors make the wife's separate estate liable for mere labor performed by him."

The Supreme Court of Alabama, in the case of *Nance* v. *Nance,* 84 Ala. 375, which was cited with approval by this court in *Morris* v. *Fletcher, supra,* said: "The evidence shows that the husband expended his skill and labor in making valuable erections and improvements on the lots after marriage, and it is insisted that complainants have a right to condemn to their demands the value of the labor. The bestowment of the labor in improving the separate estate of the wife did not constitute her a debtor to the husband, nor can her separate estate be charged therewith in favor of the husband's creditors." The court in that case held that creditors could not reach money or materials belonging to the husband and used by him in improving his wife's property, provided the amount did not exceed the limit of his personal exemptions.

We are not prepared to say that there are no limitations upon the right of the husband to expend his time, labor, skill and experience in managing or improving the separate property of his wife, and deny his creditors the fruits of the same in the enhancement of the value of the land and the increased rents and profits by reason of such contribution; but we have no hesitancy in announcing the rule that the wife's property is not liable to the creditors of the husband for augmentation of the

rents and profits or enhancement of value on account of any reasonable contribution of his time, labor or skill in the management of the property.

We think the proof is sufficient by a clear preponderance to show that the first payment of $1,000 on the purchase of the Wright place was made by Mrs. Sharp out of her own funds, and that the annual interest payments since that time have been paid out of the net proceeds of the rents and profits issuing from that place and from her homestead.

The chancellor therefore erred in decreeing the purchase in her name to be fraudulent and void.

3. The other property in controversy, viz., the lots in the town of Alma, the sawmill stock, Montague notes, and investment with Wright & Co., were all acquisitions during the year 1901. As stated before, neither Sharp nor his wife had any money or property of substantial value in 1897, and it is manifest that the above acquisitions resulted from operation of the Wright farm, bought by Mrs. Sharp, or the Sharp and other farms rented and operated by John Sharp from year to year. His farming operations during those years, aside from his management of the Wright farm, seem to have been quite extensive, though he is unable to show any substantial profits arising therefrom. His own statement as to the amount of crops raised on the various farms under his control is not clear, and there is some conflicting testimony on the point. His testimony as to the quantity of cotton raised on the Wright place is 135 bales for the year of 1898, of which his wife received 31 as rent; 115 bales for the year 1899, of which she received 28, and 205 bales for the year 1900, of which she received 51. The Sharp place was much larger, and, according to some of the witnesses, more productive, yet he does not show any profits during the same years from that place. We think that this proof establishes the receipt of sufficient profits from the Wright farm to cover the annual payments of interest, taxes and repairs on that place, but not that all the funds invested in other property came from that source.

Under the circumstances, the burden is upon Mrs. Sharp to show distinctly that the funds she used in these purchases

and investments were not furnished by her husband, and that they did not accrue from his earnings. Especially is the rule applicable where it is shown that, in addition to her farm, he had the management and control in his own right of other farms of at least equal productiveness, and mingled the products of all at will. She is held to a strict showing of the amount of profits received from her own farm, and how it was expended. *Hershey* v. *Latham*, 46 Ark. 542; *Driggs* v. *Norwood*, 50 Ark. 42; *Leonard* v. *Flood*, 68 Ark. 162; *Reeves* v. *Slade*, 71 Ark. 611; *Wilks* v. *Vaughan*, 73 Ark. 174; *Davis* v. *Yonge*, 74 Ark. 161.

Conceding that the proof shows that the profits from the Wright farm exceeded the aggregate amount paid on interest, taxes and repairs on that place, and that some of the subsequent investments came from that source, we cannot say, with any degree of certainty from the proof, what amount thereof was so invested, and in which of the investments her funds were used. Unless we can find from the proof, which we do not, that all of the subsequent purchases and investments were made with her funds, how can we single out any particular purchase or investment, and say that this or that was made with her funds? We can do this with the Wright farm, for the reason that we find that the first payment was made with her funds, the contract for purchase was made by her, the profits from that place were sufficient to cover the payments subsequently made, and we can assume that these profits were primarily applied in the payment on that place.

The chancellor found that the proof did not sustain the claim of Mrs. Sharp that these purchases and investments were made with her own funds, and not with those of her husband; and we think his findings in that respect are not against the preponderance of the testimony.

As to the lands described as the "Wright farm," the decree is reversed and remanded, with directions to enter a decree dismissing the complaint for want of equity; in all other respects the decree is affirmed.