## BUCHANAN *v*. WILLIAMS.

### Opinion delivered June 13, 1913.

1. OFFICERS—USURPATION OF OFFICE—FEES.—In an action by the party rightfully entitled to hold the office of sheriff and collector against one who improperly held the office, to recover from the latter the fees collected by him, where defendant knew he was holding an office to which he was not entitled, *held*, defendant can not profit by his own wrong, and his bond, although filed after the statutory time, will be treated as filed on time, and plaintiff may recover said fees. (Page 339.)

2. FRAUDULENT CONVEYANCES—IMPROVEMENTS ON PROPERTY OF WIFE.— A debtor conveyed all his visible property subject to execution, to his wife, and with his own money thereafter made improvements thereon in a sum in excess of a judgment against him, held, by the plaintiff. *Held*, such excess will be decreed to constitute a lien on the property conveyed. (Page 340.)

3. FRAUDULENT CONVEYANCES—CREDITOR'S ACTION—BURDEN OF PROOF.— In an action to subject property voluntarily consigned by a debtor to his wife, to the satisfaction of a creditor's judgment, where the debtor claims that the money used in improving said property was his wife's, the burden of proving the same is upon the debtor. (Page 343.)

4. FRAUDULENT CONVEYANCES—CREDITORS—FRAUD.—A voluntary conveyance made with an actual intent to cheat, hinder or defraud either existing or subsequent creditors is void as to such creditors. (Page 343.)

5. FRAUDULENT CONVEYANCES—CREDITORS—ACTION—EVIDENCE.—In an action to recover fees collected by appellee while holding an office pending an appeal, upon which appellant was declared to be entitled to the office, the evidence held to show that appellee began to prepare for financial troubles and fraudulently conveyed his property beyond the reach of his creditors, before appellant became a candidate against him for office. (Page 346.)

6. FRAUDULENT CONVEYANCES—WHO MAY ATTACK—SUBSEQUENT CREDITORS.—In order to constitute a conveyance fraudulent, it is not necessary that fraud exist as to any specific subsequent creditor; but it is sufficient if it exists as to subsequent creditors generally; and although appellee, who had long held the office of sheriff and collector, could not have known that appellant would oppose his election to the office, he will be held to have known that some one would do so, which brings appellant into the class of subsequent creditors. (Page 350.)

Appeal from Garland Chancery Court; *Alonzo Curl,* Special Chancellor; reversed.

*J. B. Wood,* for appellant.
*M. S. Cobb,* for appellee.

SMITH, J.   This appeal is the closing chapter of the contest between appellant and appellee, R. L. Williams, over the office of sheriff and collector of Garland County for the term beginning the 31st day of October, 1906. In one form or another this is the fourth appeal in this cause. *Williams* v. *Buchanan,* 84 Ark. 404, 106 S. W. 202; *Williams* v. *Buchanan,* 86 Ark. 259, 110 S. W. 1024; *Buchanan* v. *Parham,* 95 Ark. 81, 128 S. W. 563.

The election out of which this suit arose was held on the 3d day of September, 1906, and appellee Williams, who received a certificate of election, acted as sheriff until the final termination of the litigation involving the office, and turned the office of sheriff over to appellant on June 9, 1908; but appellee served as collector for the full two years, and made the collection of taxes for both the years 1906 and 1907. The circumstances under which he exercised the duties of the office of collector, and the con-

ditions under which he held it are discussed in connection with another feature of this case.

This suit involves the fees and emoluments which accrued to the office of sheriff and collector for the term beginning October 31, 1906, and also to set aside certain conveyances of property, located in the city of Hot Springs, made by the appellee Williams of this property, and to have a lien declared in favor of the appellant on certain property, the legal title to which is now in his wife, and also to have certain parties decreed to be trustees, holding the legal title to certain other lands in favor of the appellant.

The record is a very voluminous one, and a great many questions, more or less collateral to the main issue, were inquired into, and, while this record has been very carefully considered, it would not be possible within the scope of any ordinary opinion to review and discuss all these questions, and we announce only in a general way our findings thereon. The chancellor made a finding that the fees of the sheriff's office for the two years, and the net fees of the collector's office for the year 1906, had been $4,783.20, and rendered a judgment in favor of appellant for this sum, but refused to charge appellee Williams with the collector's fees for the year 1907. And the court also found that certain conveyances, made by Williams to his daughter, and son-in-law, and to his wife, who were defendants in the trial below, and are also appellees here, were not made in fraud of any creditors, either existing or subsequent; the finding being that the conveyance to his son-in-law was in satisfaction of a valid subsisting indebtedness, and that, while the conveyances to his wife were voluntarily made, he was not insolvent at the time they were made, and there was no intention to defraud any creditor, either existing or subsequent. Appellant appeals from the decree of the court pronounced upon the report of the master in adjusting the account for fees and emoluments, and claims that he should have had judgment for a very much larger sum than that which was rendered in his favor, and he appeals

also from the action of the court in refusing to uncover the property conveyed as aforesaid. Williams prosecutes a cross appeal from the court's refusal to allow him certain credits upon his accounts as sheriff, which he says he should have.

On May 15, 1903, Williams purchased from one Sarah Peters lots 6, 7 and 8 in block 59, and caused the same to be conveyed to his wife. On January 14, 1901, Williams conveyed to his daughter, B. A. Gentry, part of lots 5 and 6 of block 97 and lot 4 of block 46, and on April 15, 1902, caused the same property to be conveyed by his daughter to his wife, Martha E. Williams. The chancellor found, and Williams admits, that these conveyances to his wife were voluntary; but he insists that he was solvent at that time, and that he had the right to convey the property to his wife. On May 2, 1908, Williams conveyed to his son-in-law, W. W. Gentry, part of lots 4 and 5 in block 68 of the city of Hot Springs for the recited consideration of $17,000, but for the actual consideration of $22,000, of which amount the appellee claims that $17,000 was for a pre-existing account of long standing between himself and his son-in-law, and that the remaining $5,000 was paid in cash and credited at the time upon a note of said Williams held by the Arkansas National Bank. Williams admits that this conveyance divested him of the title to all of his visible property which might have been reached by execution; but he says the conveyance was made in payment of a valid indebtedness, due by him, and that the consideration paid not only represented the full value of the property, but that it was considerably more than the value of the property.

The authorities differ as to whether or not in a case like this net fees or gross fees should be charged; but we need not consider that question here, for appellant says, "The chancellor in this case found as a matter of law, which, for the purpose of this case, we do not controvert, that Buchanan should recover from Williams the emoluments of the office, less the necessary expenses in-

curred by Williams in conducting the office.'' And upon that basis we can not say that the chancellor's finding is contrary to the preponderance of the evidence; but, upon the contrary, we are of opinion that Williams was not charged with an excessive amount on account of the fees and emoluments of the office for which judgment was rendered.

But we think he was in error in not charging Williams with collector's fees for the last year of the term of office. The law requires that the collector shall file a bond as such with the clerk of the county court, prior to the first Monday in December preceding the tax collection, and at the time when this should have been done an appeal was pending from the judgment of the Garland Circuit Court, declaring Buchanan to have been elected, and he was prevented from assuming the duties of either sheriff or collector by virtue of this appeal. Williams failed to file this bond, and the facts in regard to this failure are detailed by R. H. Mooney, who testified as follows: That he had been clerk of Garland County since the 1st day of November, 1908, and was the deputy county clerk prior to that time; that Mr. Williams filed his bond for the year of 1907 on the 11th day of December at 9 A. M., and the bond was approved by the county court on the same day; that Mr. Williams did not file his bond as collector prior to the first Monday in December, and he made a certificate, as deputy clerk, certifying to the Governor that Williams had not filed his bond as collector, and the Governor thereafter immediately appointed Williams to fill the vacancy caused by this failure; that, while he did not remember the date of the certificate, he made it just as the clock struck 12 at night, and that Williams, and his attorney, and the county judge were present when it was made; that he had retired to his room when the county judge came, and he had a written order to him to issue the certificate, and that he got out of his bed, and went to the clerk's office, and issued the certificate. It appears to have been thoroughly understood that this certificate would be asked

for, and that this had been discussed by the witness and the clerk, and the clerk had said that he would take any responsibility upon himself that might come up in the matter. Although the bond was not filed until the 11th, it was dated the 5th, and the affidavit of one surety was made on the 6th, and the bond was for the sum of $250,-000. The principle of law which governs this transaction is one so just that it need only to be stated for its justness to be conceded, and which has been so long recognized that the memory of man runneth not to the contrary. It is that no man shall be permitted to profit by his own wrong. Here Williams was holding an office to which he must have known that he was not entitled, and a decision to that effect had already been rendered against him in the circuit court, and was afterward affirmed on his appeal, and it was only by virtue of this appeal that Buchanan was being kept out of office. Indeed, the proof shows that Buchanan filed a bond as collector in the required amount on November 27, 1907; but this act was unavailing on account of the pendency of the appeal. The purpose of the appellee in failing to file this bond was so manifest that we can not remain ignorant of it, and we will apply the maxim that "equity looks upon that as done which ought to be done," and accordingly we treat the bond as filed within the time limited by law, and we charge Williams with the commissions of the year 1907, less the same allowance for the expenses of the collection, which the chancellor allowed for the previous year, and we will add that amount to the sum for which appellant should have judgment, together with the sum of $900, shown to have been received as commissions upon the collections of the liquor license for the last year of this term. And this increases by $4,314 the amount for which appellant should have judgment.

We come next to the question of the validity of the conveyances by appellee Williams to his wife and daughter and son-in-law. Appellant very earnestly insists that the conveyance to Williams's son-in-law, W. W. Gentry, was invalid for the reason that it divested him

of all visible property, subject to execution, and Williams admits that this is a fact; but he says, and the chancellor found, that this conveyance was made in payment of a valid subsisting and outstanding obligation, due and owing by him.   We will not undertake to decide that question for the reason that we have found that Williams expended of his own money upon blocks 97 and 46, and the other property, a sum of money in excess of the amount for which appellant is given judgment, and which excess we here decree to constitute a lien thereon.   As has been stated, these blocks, 97 and 46 were conveyed by Williams to his daughter and her husband on the 14th day of January, 1901, and were by them conveyed to Martha E. Williams, appellee's wife, on April 18, 1902. There were valuable improvements on these lots, which were destroyed by fire on February 25, 1905, and soon thereafter Williams began the construction of the valuable buildings now standing thereon, and on block 59, and completed them before the beginning of the term of office here involved.   One of the principal questions of fact involved in this case is the cost of a brick building erected upon this block 97.   Williams testified that its cost was between $15,000 and $20,000, but that he had kept no special account of its cost, and suggested to appellant that he have some contractor figure on the cost of the building, and this was done, and the contractor testified that the building would be worth $24,578.95; but, after allowing the profit of 10 per cent. which a contractor usually figures upon, the building could have been erected at a cost of $22,324.50.   Appellee finally said that the building was worth not exceeding $17,000; but under the circumstances we think he should be charged with his first highest estimate, and accordingly we find the value of the building to have been $20,000.   Without going into the detail of the other buildings and money expended by him in improving the property he had conveyed to his wife, we announce our conclusion that the evidence shows the value of the other buildings erected by him to have been as follows:  Cost of cottage, $1,300;

storehouse on block 68, $4,000; cost of house on block 59, $13,500; cost of residence and furnishings, $12,000—making a total of $50,800, which was expended by Williams upon the above described lots. This is a larger sum than he admits the buildings cost, or are worth; but we think a fair preponderance of the evidence warrants the fixing of the values at the sum named. Williams undertakes to show the various means by which he realized upon the various assets belonging to his wife, in the attempt to show that his own money did not go into these improvements. But, after consideration of all of this evidence, we are of opinion that he has not accounted for more than the following amounts of money; Williams shows a deposit in the Arkansas National Bank of $12,058.11, but, after considering the evidence, it is manifest that he takes credit for $10,000 of this money twice, and that $10,000 deposited in the Arkansas National Bank was the same money which he borrowed from the Security Bank; $17,200 from the insurance company; $4,100 from the sale of property on Benton street; $1,500 from the sale of a wholesale feed business which Williams had been conducting in his wife's name; and $1,000 from some race track property. Thus it appears that the money which he accounts for as belonging to his wife did not exceed $36,000, and the amount which he expended on the improvements exceeds $50,000, leaving a sum considerably in excess of the amount for which we have rendered judgment in appellant's favor. Appellee Williams claims that there should be credited in addition about $5,000, received from the rents of this property, which was applied on the cost of buildings; but we do not think that he has made such a showing as to the amount of the rents, nor as to their use as to entitle him to have them credited in this account. It is true that he collected rents and placed them to his credit at the Arkansas National Bank; but we think that the above statement of receipts and disbursements of his wife's money by him is a liberal one to him, under all the facts and circumstances in proof.

Williams admits his wife had no separate bank account prior to the fire in February, 1905, and thereafter she had two accounts, the first of which was opened 10-24-1905, and the total deposits of that account aggregated $15,083.11, and the second account was opened 10-21-08, and closed 1-6-1910, and the deposits amounted to $2,853,83, making a total of deposits of $17,936.94. In addition, a considerable part of the $17,200 insurance money was received from the buildings on the lots claimed by Mrs. Williams, but the exact amount so received is not entirely clear; but all of the insurance money was deposited by Williams to the credit of his account as collector, and, while some of it went into the construction of the new buildings, it is equally as certain from Williams's own statement that all of it was not so used.

The burden was upon him to show the application of his wife's money to the improvement of her property, and this he has not done, except as to a part of it. We can not know from the record what proportion of the cost of any building, including the residence, was paid with Mrs. Williams's money. His home was probably the last building erected, although the business houses in block 97 were not completed when the residence was begun, and there were a number of checks offered in evidence which Williams could only say were used on his buildings in block 97, but could not say on which one, and in fact he made no attempt to show where any particular money was spent. Appellee contents himself with the attempt to show that he received from all sources a sum of money belonging to his wife which equaled the cost of the buildings on her property, without undertaking to show where any particular money was spent; but as shown above we do not think the proof establishes even that fact.

A number of cases in our reports discuss and decide the question of the validity of conveyances of insolvent debtors, both as to existing and subsequent creditors; but, the rule is nowhere better stated than by Judge

RIDDICK in the opinion written by him in the case of *May v. State National Bank*, 59 Ark. 614, 28 S. W. 431. In this case the decisions of our court and those of a number of other States are reviewed, and the conflict which appears to exist in the decisions is pointed out. It was there said: "The rule that, in order for a subsequent creditor to impeach a voluntary conveyance by a debtor prior to the creation of his debt, he must show an actual intent to defraud has been repeated and followed so often by this court that it has become to a certain extent a rule of property which should not be overturned. But, considering these decisions in connection with the statute (Kirby's Dig., § 3658), we hold that a voluntary conveyance made with an actual intent to cheat, hinder, or defraud either existing or subsequent creditors is void as to the creditors, both prior and subsequent." The facts of the *May* case, in which the above rule was announced, were that one Neal was heavily in debt, and in an embarrassed financial condition, owing a large sum of money, with assets not greatly exceeding his indebtedness, and he made a voluntary conveyance to his nephew and sister of lands embracing a valuable portion of his estate. Deducting the property thus conveyed, he was left practically insolvent. After the conveyances were made, he still used the property as his own, placing valuable and extensive improvements upon it. At the time these conveyances were made he was engaged in large business enterprises, and continued in business, with his debts steadily increasing down to the time of his failure, which occurred about two years after the conveyances were made, and it was there said that those conveyances were void, both as to prior and subsequent creditors We adhere to the rule announced in that case, and, when applied to the facts of this case, as we understand them to be, we think the expenditure of Williams's money upon the property which he had conveyed to his wife, is such a fraud against appellant as a subsequent creditor that he is entitled to have the amount due him by Williams charged as a lien against

the property conveyed by Williams to his wife and improved by him for her.

Williams kept two bank accounts, one in the name of his wife, which was twice opened and closed, as above stated, and the other in his name as collector, and he appears to have checked against these accounts indiscriminately, confident that his wife would ask no accounting, and that he could and would make good his official accounts when called upon to do so. His wife appeared to have had no control or management of any of the property which he said she owned. He bought and improved property for her, requiring the outlay of large sums of money, and made large improvements which he says were hers, as freely as if they had been his own. It does appear from the evidence that he talked with her about the control, which he says he exercised of her money and property; but these conversations appear to have been only such as any man would have had with a good wife who was interested in her husband and his affairs. Although he was the collector of the taxes, the property appears upon the tax books in his own name, and the taxes were paid by him in his own name. In the construction of his expensive building in block 97, he had his own name, R. L. Williams, placed upon the cornice in large letters. He appeared to have had a practice, which had grown to be a habit, of indorsing paper, and the amount of the indorsement appeared to have cut no figure, if a friend was accommodated; indeed, he seems to have been more concerned about accommodating his friends than he did about saving his money, and many of these friends obligingly permitted him to pay their debts, contracted upon his indorsement. He appears to have been deeply engrossed in politics, and very intent on winning, and that without regard to the cost, and this may account for his constant liability upon his indorsements. From his own statement, it is apparent that he never knew the number of the indorsements, nor the extent of his actual or probable liability thereon. He was upon the official bond of his predecessor in office, who

was elected in 1896, and who defaulted in quite a large sum, and whose sureties were exonerated from liability by a special act of the General Assembly, approved March 29, 1901.

A study of appellee's evidence leads irresistibly to the conclusion that, at a time when he was possibly solvent, and before appellant became a candidate against him for office, appellee must have begun to prepare for the breakers which his loose financial methods would necessarily develop, and he commenced putting property away beyond the reach of any creditor whom he might not care to pay. He states himself that he was hard up at the time of his son's death in March, 1899, when he borrowed the first money from Gentry, his son-in-law, and this indebtedness to his son-in-law constantly grew larger until, at the time of the conveyance to him of what was left of his estate, he was indebted to him in the sum of $17,000, and Gentry says only $12,600 of this was principal, and the remainder was interest. It appears that, while he may have intended to meet his obligations generally, he proposed to be in a position to use his discretion and consult his own pleasure in doing so, and he did not want to be in a position to be coerced, and it is unmistakable that his intention was that appellant should not be paid at all. At the hearing before the master, when it was sought to ascertain what the net receipts of the office were, a deputy sheriff and the bookkeeper testified that the cashbooks had disappeared about the time that Williams went out of office, and the ledger also disappeared, and had not since been found, and the matter of profits of the office was left to some extent a matter of conjecture. Appellee did not turn over to appellant any book containing the accounts of the sheriff's office, and this circumstance is in keeping with his general course of conduct with reference to the appellant's rights.

It is true that, although Williams freely lent his credit, he sometimes took ample security to protect himself in his indorsements, yet it was not his practice to do so, and it appears that at one time during the year 1906

he was indebted to the Arkansas National Bank, either actually for money loaned him, or potentially upon his indorsements, for about $35,000, and, while this was the maximum amount he ever owed that bank, he was always under considerable liability to that bank. It is true that the cashier of the bank testified that they were never uneasy about the money due them; but this faith may have been inspired by the use which Williams was making of the property under his control. The proof shows that, upon making his settlement as collector of the public revenues for the year 1906, it became necessary for him to borrow $9,300, and while he appears to have had no trouble in raising this money, it shows the reckless manner in which his financial affairs were conducted. By his own statement he executed a number of mortgages upon his city property during the time he held the title, and, while these mortgages were paid, it shows that he was always more or less indebted. He seeks to establish the good faith of his conveyances to his son-in-law by showing that at the time of that conveyance he was justly indebted to him in the sum of $17,000, and by his own statement a portion of this indebtedness would have been barred by the statute of limitations, had he cared to exercise the privilege of pleading it, and this indebtedness had begun as a comparatively small sum, constantly growing larger until finally he could settle it only by conveying all that remained of his visible property.

Williams undertakes to make an explanation of the various matters here discussed, and it might be said that as to some of them he had successfully done so, if they stood alone; but, when considered together in their relation to each other, the conviction grows, until it becomes a certainty, that appellant is entitled to have satisfaction of his debt, and that it is our duty to declare a lien upon the property of Mrs. Williams for the amount of appellant's debt. It does not often happen that the proof of fraud amounts to a demonstration, for it is usually accomplished under such circumstances that it may be concealed; in fact the very purpose of its commission re-

quires its concealment, and it is only by inference and deduction that we may know of its existence, but we think the proof in this case is sufficient for us to know of its presence here.

There was a garnishment proceeding, which was consolidated with this cause, which was finally dismissed at appellant's cost. One R. S. Wood had executed a note, with Williams as indorser, dated January 13, 1905, in favor of William McGuigan, and suit was brought upon this note. The appellant claimed the note was paid by Williams, and garnished Wood, for whose benefit it had been paid. The chancellor found that, although Williams had paid the note, it was paid with money belonging to his wife, and furnished to him by her for that purpose, and we will not disturb that finding as being contrary to the clear preponderance of the evidence.

The decree in this cause will therefore be reversed, with directions to the chancellor to enter a decree in favor of appellant for the sum of $9,097.20, with interest thereon at the rate of 6 per cent. from the 27th of October, 1911, and to adjudge the same to be a lien on said blocks 97 and 46, and to order the same sold within the time and manner and upon the terms fixed by the court, if not paid by said Williams. And all costs of this cause are assessed against appellee Williams, except the costs of the garnishment proceeding, which are assessed against appellant.

McCulloch, C. J., and Hart, J., dissent from that part of opinion which declares a lien upon the property, and Justice Kirby dissents from that part of opinion holding Williams liable for the collector's commission for year 1908.

ON REHEARING.

Smith, J.   Appellee Williams has filed a very vigorous brief in support of his petition for rehearing, and challenges the correctness of some of the statements of fact contained in the opinion. And particularly does he challenge the statement that the loan secured from the Security Bank was deposited in the Arkansas National

Bank, and, in support of this attack, he exhibits with his petition for rehearing the checks drawn by him on the Security Bank for the sums of money which he said he used in the construction of the buildings. These checks were not offered in evidence at the hearing below, and no opportunity was therefore afforded appellant for cross examination; but it does appear that this loan was not transferred from the Security Bank to the Arkansas National Bank, and appellee therefore insists that we have not given Mrs. Williams credit for all the money which the proof showed she had. But it does not follow that, because we were in error as to where this money was deposited, we had not given her credit for all of the money which she was shown to have had. The important question was, ''How much money did she have?'' and not, ''Where was the money kept?'' Counsel complains also that, in addition to failing to give Mrs. Williams credit for all the money which she had, we have also fixed the cost of buildings at an excessive sum. But we do not think we have done either. It must be borne in mind that these were facts peculiarly within the knowledge of Williams, and the burden of proof was upon him to show the ownership of the money he was using, and the uses made of it. *Sharp* v. *Fitzhugh,* 75 Ark. 569, 88 S. W. 929. Notwithstanding this burden was upon him, under the law, appellant's counsel afforded him every opportunity to make these explanations. Many questions were asked him by appellant's counsel, which would have given him an opportunity to make the finding a mere matter of calculation, yet, in response to these questions, answers were given which in many instances were either evasive or uncandid, and in some instances more or less offensive to the interrogator. The checks now produced illustrate the difficulty of this case. We gave appellees credit for the entire $10,000 borrowed from the Security Bank as having gone into the improvements, yet the checks which are now produced aggregate something less than $8,000, and it therefore appears that a mistake of $2,000 in their favor resulted in our finding.

It may be said as to a very large part of the money said to belong to Mrs. Williams that no attempt is made to show upon which building it was spent, for Williams contented himself with the attempt to show that he came into possession of enough of his wife's money from all sources to construct these buildings, including his residence. But we think that proof insufficient even for that purpose.

There were a number of circumstances developed in the proof, which were not reviewed in the opinion, which, taken in connection with all the proof, were regarded as significant. One of these was the difference between the actual and the recited consideration in the deed from Williams to Gentry, in connection with the fact that the conveyance was not to Gentry, who loaned the money, but was to Gentry and his wife, who was Williams's daughter. This is the deed which conveyed all that was left of the visible property owned by Williams, and which was made after his financial troubles had come upon him, but is said to be valid, because it was made in consideration of an existing liability and a new consideration of $5,000 in money. Appellee also attacks with much vigor the application which we make of the opinion in the case of *May* v. *State Nat. Bank,* 59 Ark. 614, 28 S. W. 431, in regard to fraudulent conveyances with reference to subsequent creditors. But we think we have made a correct application of the law of that case, as applied to the facts of this. Appellee insists that we have not, because he says that Williams could not have contemplated at the time of his conveyances to his wife that appellant would ever oppose him for office, or that he would ever become appellant's debtor. But it is not essential that this intention to defraud exist as to any specific, subsequent creditor; for it is sufficient if it exists as to subsequent creditors generally. Here the proof is that Williams had been sheriff for a long time, in fact he had held that office until it had become almost an occupation, and by his own statement his campaigns were protracted and expensive, in fact a part of the debt which he said he

owed his son-in-law was for campaign contributions, made so long prior to the date of the deed that the statute of limitations would have been available had Williams cared to plead it. The record is that during his campaign against Buchanan Williams publicly stated that he had become much involved, and his obligations amounted to as much as $45,000, and in his deposition he explained the loan made to him by his son-in-law about the time of the death of his son Johnnie on March 16, 1899, that he was then hard up, and needed money. This loan was not only never paid, but that indebtedness was constantly increased, and it is difficult to tell from this record when Williams became insolvent; but, if the Gentry indebtedness was genuine, he must have been insolvent before the conveyances to Mrs. Williams were made. And, while he could not have known that Buchanan would oppose his election, and later successfully contest with him in the courts for the possession of the office, there is no doubt that he knew some one would do so, for he says he was always vigorously opposed, and his campaigns must have been very expensive.

A careful consideration of all the proof appears to sustain the finding that, at the time of the conveyance to his wife, Williams har conceived the purpose of placing his property beyond the reach of possible creditors and yet not beyond his own control. When asked his financial condition at the time of the conveyance to his wife, and what the purpose of that conveyance was, he said that he did not know how much he then owed, and he further said: "I wanted her to have the property, if anything happened to me. I did not know what time some crazy fellow might kill me, and I wanted her to have it as long as she lived. I wanted her to have it without any trouble, if anything happened to me."

The judgment heretofore entered by the court must be modified. Chief Justice McCulloch and Justice Hart agree with Justice Wood and the writer that judgment was rendered here for the correct amount; but they do not agree in holding that there should be a lien declared

upon the property conveyed to Mrs. Williams for any sum, while Justice KIRBY is of the opinion that judgment should be rendered only for the sum of $4,783.20, with the interest thereon, and does not agree that a lien should be declared for any greater amount.

The former judgment is therefore modified to the extent of ordering a lien to be declared against blocks 97 and 59 in favor of the appellant for the sum only of $4,-783.20, and interest.

HART, J., (dissenting). The principles of law in regard to fraud in voluntary conveyances is well stated by Mr. Justice RIDDICK, in the case of *May* v. *State National Bank,* 59 Ark., at page 624:

"While it is now settled by the repeated decisions of this court that actual fraud must be shown to avoid a voluntary conveyance in favor of a subsequent creditor, yet by this is meant only that, as to the subsequent creditor, an intention to defraud must be proved, while, as to the existing creditor under the same circumstances, it may be presumed, even though the transaction be entirely honest."

The court further said that this intention to defraud may be shown by all the circumstances surrounding the transaction, as any other fact may be proved.

The record in this case is very large, and it would unduly extend either a dissenting opinion or the majority opinion of the court to recite in detail all the facts proved in evidence. At best, we can only summarize the facts as they appear to us.

It is true that Williams became liable on Houpt's bond, as sheriff and collector, in 1901, to the possible amount of $7,700; but he was released from any liability thereon by act of the Legislature approved March 29, 1901. He conveyed the property involved in the present controversy to his wife in 1901 and 1902. At that time, Williams testifies that he had more than enough property left with which to pay his debts after conveying the lots in question to his wife. At the time he gave his testimony, he said that he did not owe five cents then which

he owed when the conveyances were made. Buchanan ran against him for sheriff in 1906, and, of course, it could not be known that there would be a contest as to the result of the election until after the result had been declared. It does not appear that during the years intervening between the time that Williams made the conveyances to his wife and the date at which Buchanan began the contest against Williams for the office of sheriff that Williams entered upon any business hazardous in itself or likely to result in his insolvency. In other words, to my mind the record does not disclose that Williams made the conveyances to his wife with the view to his being indebted at a future time. The fire occurred February 25, 1905. The undisputed evidence shows that the house was rebuilt on block 97 right after the fire in 1905. Williams superintended the erection of the buildings on this lot and on the other lots previously conveyed to his wife; but this he had a right to do under the authority of *Martin* v. *Banks*, 89 Ark. 77. An architect made an estimate of the probable cost of the erection of the building on block 97 and placed it at $22,000. Williams placed the cost at from $15,000 to $20,000, but, after reflection, fixed it at about $17,000; and this we consider a reasonable amount, taking into consideration his experience in the erection of buildings and the fact that he gave his own services in the erection of it. Early in 1905, after the fire, he also erected a cottage on block 46, which they used temporarily as a home, and which cost $1,300. The record shows that the house on the lots in block 59 was built in 1905, after the 10th day of August, and cost $13,-500. The home was rebuilt on lot 46 early in 1906 at a cost of $10,000, and $2,000 was expended for furniture. The record also shows that Mrs. Williams obtained $17,-200 from the insurance companies in 1905, after the fire. She deposited a little over $12,000 additional in the bank, $10,000 of which, according to the contention of Buchanan, was borrowed from the Security Bank. Mrs. Williams also got $4,100 from the sale of some property on

Benton Street in Hot Springs. She got $1,500 from the wholesale feed business and $1,000 from a race track concession. This amounted, in round numbers, to about $36,000. In addition to this, Williams says that she got about $5,000 rent from the buildings which were rebuilt after the fire; but this statement is contested by Buchanan. It is evident, however, that she obtained a considerable amount of money from this source, for it is conceded that the building on block 97 was erected shortly after the fire in 1905, and it is shown that this was a very valuable building for business purposes, and that it was rented as soon as it was erected. This testimony shows that Mrs. Williams had ample means with which to erect the buildings on blocks 97 and 59, and that her money was used for that purpose.

In the case of *Ferguson* v. *Little Rock Trust Co.,* 99 Ark. 45, the court held:

"Fraud is never presumed, but must be proved, and this may be done by inference from circumstantial evidence, but no such inference can arise from doing an act warranted by law.

"An insolvent debtor may exchange lots which are subject to the claims of its creditors, but upon which they have no liens, for a homestead which is not subject to their claims."

Williams had the right to use his own means in rebuilding the home on lot 46. This property was their homestead and was used as such before and after the fire, which occurred, as above stated, in February, 1905. *Pullen* v. *Simpson,* 74 Ark. 592. Moreover, this building was erected in 1906, before the contest for sheriff between Williams and Buchanan had been begun, and Williams could not even anticipate at that time that the result of the election would be contested. It certainly could not be said, in any event, that a lien should be declared upon the property of his wife for the $2,000 which he expended for furniture in their home. This was personal property and never became a part of the realty.

McCulloch, C. J., concurs.