## FORD *v.* FORD.

### Opinion delivered October 23, 1911.

EVIDENCE—EXPERT WITNESS—FORM OF HYPOTHETICAL QUESTION.—It is error to permit a hypothetical question to be asked which fails to embrace all the essential undisputed facts which bear upon the issue.

Appeal from Pulaski Circuit Court, Second Division, *F. Guy Fulk,* Judge; reversed.

*Mann, Rollwage & Morrow,* for appellant.

1. Witnesses cannot draw conclusions from a given state of facts, and give such conclusions in evidence. They must state facts, and let the jury determine upon the facts, not upon their opinion of them. 66 Ark. 494; 24 Ark. 251.

2. Physical infirmities, the use of morphine and liquor for many years and even a partial eclipse of the mind would not prevent one from making a valid contract or from disposing of his property if he knew and understood what he was doing at the time. 27 Ark. 166; 49 *Id.* 367; 73 *Id.* 281. Expert testimony based upon hypothetical questions will not be allowed to control or set aside testimony based upon actual facts and conditions. 50 Ark. 511; 73 N. W. 1023; 1 N. E. 687

3. Undue influence by appellant was not shown by the testimony, nor that confidential relations existed. There must be a malign influence resulting from fear, coercion or other cause, depriving him of free agency. 78 Ark. 420. Appellant paid the dues upon the policy, furnished money for the treatment to get relief from the morphine habit and paid all expenses of the last illness. These and many other acts of kindness were sufficient to influence deceased to transfer the policy. 49 Ark.369.

4. The hypothetical question asked Dr. Morrow did not fairly reflect the evidence, nor was it responsive to the real facts. *Taylo·* v. *McClintock*, 87 Ark. 294; 24 N. W. 482; 134 Mass. 505; 112 Mo. 45; 21 S. W. 737; 70 Pac. 996. The fact that deceased had performed work was undisputed, and it was error not to include the fact in the hypothetical question. 87 Ark. 294; 77 *Id.* 426; 96. N. W. 338.

*H. A. Parker* and *J. W. House & J. W. House, Jr.*, for appellees.

1. The evidence fully sustains our contention that the mental condition of Chas. F. Ford, Sr., was such as to incapacitate him from making a valid contract. The effect of whisky and morphine on the human system is well known and recognized by the courts. 76 Ark. 288; 64 *Id.* 530.

2. Opinions of witness based on proved facts are admissible in evidence as to sanity, mental condition, etc. 117 Mass. 137; 76 Ark. 288; 64 *Id.* 523; 54 *Id.* 599; 15 *Id.* 601; 17 *Id.* 292; 22 *Id.* 3.

3. Expert evidence based on hypothetical questions, stating the facts, is always competent. 50 Ark. 511; Rogers on Expert Testimony, § § 37-42; 1 ·Wharton & Stille, Med. Jur. § § 194-198.

4. Undue influence is proved beyond controversy, amounting to coercion.

5. The hypothetical question asked Dr. Morrow stated the facts sufficiently. 87 Ark. 294; 77 *Id.* 423; 96 N. W. 429; 98 Ark. 352; 1 Wigmore on Ev. 682. Besides, there was no sufficient objection to the question. 131 S. W. 46; 36 Ark. 653; 52 *Id.* 180; 11 S. W. 959; 26 Am. St. 163; 73 Ark. 407; 84 S. W. 494; 85 S. W. 428.

McCULLOCH, C. J.   Charles F. Ford, of Marianna, Arkansas, was at the time of his death on November 21, 1909, a member of the Royal Arcanum, a fraternal benefit association, and as such member held a benefit certificate therein in the sum of $3,000, payable to his brother, the appellant, Marshall H. Ford.   He joined said association in the year 1879, and, being then unmarried, his first benefit certificate was made payable to the appellant and his sister, Mrs. Govan.   He married in the year 1883, and soon thereafter caused his benefit certificate to be made payable to his wife.   He was then living in Marianna, but about the year 1891 he moved to Helena, where he resided with his wife until the year 1905, when he moved back to Marianna, leaving his family in Helena, and resided in Marianna until his death.   He and his wife separated when he left Helena, and thereafter they lived apart, she obtaining a divorce from him by a decree of the chancery court rendered in January, 1907.   During his membership in said association he changed his benefit certificate several times.   In June, 1905, he changed it from his wife to his daughter and two sons.   In January, 1907, he changed it to his three sons, the appellees in this cause.   In January, 1908, he changed it so as to make $500 payable to appellant, and the remainder to two of his sons.   The last certificate, making the entire amount payable to appellant, is dated April, 1908, but the first application for that change was made on February 18, 1908, and the corrected application upon which the certificate was finally issued bears date March 14, 1908.   Changes could, by the laws of said association, be made at the will of the member.   After the death of Charles F. Ford and the payment of the full amount of the benefit to appellant, the appellees instituted this action in the circuit court of Pulaski County against appellant to recover the amount so collected, alleging that the last change of benefit certificate was procured by undue influence over the said Charles F. Ford, and also that the latter was at the time of said change mentally incapable of transacting any business.   Appellees claim the money under the certificate issued in January, 1907, which was payable to them.

The allegations of the complaint as to undue influence and as to mental incapacity of Chas. F. Ford were denied in

the answer, and the trial of the cause before a jury resulted in a verdict and judgment in favor of appellees against appellant for the full amount of the policy.

The testimony adduced by appellees established the fact that Charles F. Ford was addicted to the excessive use at times of intoxicating liquors, and that about the year 1892 he also became addicted to the habitual use of morphine, of which habits he was never entirely cured, though he resorted to treatment therefor as many as four times. He went to Memphis for treatment on two different occasions, the first being in the year 1895, at what is known as the Keeley Institute, and again in February, 1908, at a similar institution. He, also went to Little Rock for treatment, and also to Kansas City, where he was treated in institutions of that sort.

The witnesses on the part of the appellees testified that Charles F. Ford's mind became affected to.the extent of weakening his mental powers on account of the use of liquor and morphine, and that before he became separated from his wife, as a result of the use of the drug and liquor, he at times mistreated his wife.

The testimony adduced by appellant tended to show that his mental powers were not in a weakened condition from the time he moved back to Marianna in 1905, and it established, beyond dispute, the fact that from the time he came back to Marianna up to the time of his death he was almost constantly engaged in various kinds of business. He clerked.in stores, managed a grocery store for his brother (the appellant), was jailor for a time under his brother, who was sheriff of the county, was deputy tax collector under his brother, and collected taxes and issued receipts therefor, and that during one cotton season he weighed cotton at one of the warehouses, his duties being to weigh the cotton and keep a record of the weights, gin marks, names of seller and purchaser, etc, and to attend to the shipping and marking of cotton. These facts were testified to by a large number of citizens of Marianna, professional and business men, who showed an intimate knowledge of the habits of the man and his method of transacting business. One of the witnesses was his physician, who treated him when he was ill.

During the progress of the trial counsel for appellees offered

in evidence the deposition of Dr. Samuel B. Morrow, a physician who was in charge of the Keeley Institute when Ford was treated there in 1895, and who testified to that fact. The following questions were propounded to Dr. Morrow over the objection of appellant, and the answers thereto were separately objected to:

"Q.   Take Mr. Ford in 1894 and 1895 after being treated— say that he returned from your institution, or the Keeley Institute at Memphis, and after 18 months went back to the morphine and whisky habit, and then was treated for 6 or 8 weeks for that same disease; and then two years or two and one-half years later, towit, in 1899-1901, went to a similar institution for the morphine habit, then if it is a fact that his mind grew weaker from the time he took his second treatment two years after he left your institution up to 1901 and his body also grew weaker, then in 1899 or 1901 he became in such a state of health on account of the morphine and whisky habit that he was forced to take another treatment at that date, after which he never did any work, mentally or physically, of any consequence especially on account of the weakness of his mind—now, we will say in December, 1907, or January, 1908, while again in a sanitarium for the treatment of morphine, was he then capable of transacting important business, such as the most important business of life, for instance, to make an intelligent will, or convey real estate by deed, or transfer insurance policies and business of that kind?

"A.   The longer a man dissipates with either alcohol or drug, the more deterioration takes place for nervousness. His will power becomes weaker, and his judgment faulty. While there might be at times that he could transact business correctly, at other times his judgment would be very unsteady.

"Q.   Now state, Doctor whether a person of that kind as just described in the hypothetical question above would be easily persuaded by persons he felt under obligations to and on account of their persuasions signed papers—important papers—that he otherwise would not do?

"A.   Such persons are very easily impressed and easily persuaded, provided they can be shown that it will be some advantage to them to transact that matter.

"Q.   Doctor, please state, if such a person was living

with an uncle or an aunt who had been kind to him, and was taking care of him; and where the services of this relative were worth only a few hundred dollars, say three or four hundred dollars, and he had been living in their home for 12 months or two years, would such persons have any advantage over others in inducing this supposed invalid to transfer property worth $5,000 or $6,000 over other people to whom they were not related or had no connection except as ordinary citizens?

"A. As I said before, they are very easily impressed and very easily persuaded, provided it is to their advantage. Those cases look forward to present advantages and present conditions and present feelings. They do not look so much beyond as they do to that which is to come immediately. They are very easily impressed and very easily offended, on the other side. * * *

"Q. Doctor, we will take this same patient, or supposed patient, Mr. Ford, and say from 1902 up to 1908, the latter being the date that he was supposed to make some business transaction. We will say that between those periods his physical health was extremely bad most of the time. Now, state what effect that would have upon his mind in the transaction of important business affairs of life in connection with the other things already stated?

"A. It would have a degree of effect upon his mind.

"Q. We will now take this same patient, and I will ask the following hypothetical question. We will say that he was treated by you in 1894 or 1895 for the morphine and whisky habit. He was again treated for the morphine and whisky habit two years later. Then between 1899 and 1901 he was again treated for the morphine habit in the usual way. Then in January or February, 1908, while in a sanitarium for the morphine habit (this being the fourth or fifth time), would he be competent, while under this last treatment in said institution for the morphine habit, of transacting the important business of life?

"A. If he was under treatment, I say no, he would not be."

It is urged that the first hypothetical question was objectionable on the grounds that it omitted the undisputed fact that Charles F. Ford, from the time he returned to Marianna in 1905, was continuously engaged in different lines of business,

and that the question was in direct conflict with the undisputed facts in stating that after the treatment in 1901 said patient "never did any work, mentally or physically, of any consequence, especially on account of the weakness of his mind." The other questions propounded to the witness referred to the first question and, of course, were dependent upon it, and the same vice, if any there be, entered into them on that account.

The question not only omits the undisputed fact referred to above as to Ford's habits of business after he returned to Marianna, but the question positively conflicts with that fact by stating that he did no work, mental or physical of any consequence. This statement in the question is not only in conflict with the undisputed evidence adduced by appellant, but it fails to find any support whatever in the testimony adduced by appellees, for none of the witnesses testified that Ford, after he went back to Marianna, never did any work of any consequence. Most all the testimony adduced by appellees related to Ford's conduct prior to the time when he came back to Marianna. It is true that one of the appellees, and also another witness, testified to seeing him in Marianna several times after he moved there, but neither of them testified that he did no work of any consequence, and their testimony is not in conflict with the numerous witnesses who testified on behalf of appellant.

We understand the law to be settled that a hypothetical question must embrace all essential undisputed facts which bear upon the question, and must not embrace any statement of fact which there is no testimony tending to establish. A party has the right to take the opinion of a witness upon the undisputed essential facts and any other state of facts which he claims the evidence tends to establish. In the case of *Taylor* v. *McClintock*, 87 Ark. 243, which is decisive of this question, the court said:

"The hypothetical case must embrace undisputed facts that are essential to the issue. In taking the opinion of experts, either party may assume as proved all facts which the evidence tends to prove. The party desiring opinion evidence from experts may elect such opinion upon the whole evidence or any part thereof, and it is not necessary that the facts stated, as established by the evidence, should be uncontroverted.

Either party may state the facts which he claims the evidence shows, and the question will not be defective if there be any evidence tending to prove such facts. When a party seeks to take an opinion upon the whole or any selected part of the evidence, it is the duty of the court to so control the form of the hypothetical question that there may be no abuse of his right to take the opinion of the experts. The right may be abused by allowing the opinion to be given in such a way as to mislead the jury by concealing the real significance of the evidence, or by unduly emphasizing certain favorable or unfavorable data. (Citing authorities.) The opinion evidence must be discredited because it is based upon a hypothetical case which omitted undisputed facts shown by the evidence and included other facts not proved, * * * It is impossible to divine what the opinion of the experts would have been had the hypothetical case reflected the essential and material facts established by the evidence."

There are expressions in the opinions of this court in later cases, *Missouri & N. Ark. Rd. Co.* v. *Daniels,* 98 Ark. 352, and *Arkansas Midland Rd. Co.* v. *Pearson,* 98 Ark. 399, which appear to state the rule differently, but there was no intention to change the rule laid down in *Taylor* v. *McClintock, supra,* which we now adhere to.

There is also ambiguous language in the case of *Ince* v. *State,* 77 Ark. 427, from which it may be understood that the court meant to lay down the rule that a hypothetical question need not embrace the undisputed facts, but that the party propounding the question might select any facts which he deemed to have been proved. The statement there is that "the party offering the testimony of the witness may select the undisputed facts or such facts as he conceives to be established by the evidence, and predicate his hypothetical question upon them."

It occurs to the writer hereof, who was the author of the opinion in that case, that the use of the disjunctive "or" is an error, for he is not conscious of ever having entertained the view that a hypothetical question which omitted essential undisputed facts was correct. What was doubtless meant by the language which is quoted above was that the party might select the undisputed facts, or that if the facts were in dispute

he might select such facts as he conceived to be established by the evidence and predicate his question upon them. But whatever ambiguity may be found to exist in the language, it is our purpose now to reconcile the various cases by adherence to the rule clearly stated in *Taylor* v. *McClintock, supra.*

The error in this question was prejudical, and calls for the reversal of the cause. The verdict as to the question of Ford's mental condition was, to say the least of it, against the overwhelming preponderance of the evidence, and we can not assume that the verdict would not have been different if the answers of Dr. Morrow to incompetent questions had been excluded.

It is urged that Dr. Morrow's testimony was not sufficiently positive as to Ford's mental condition to render the result of the improper questions material. We do not agree to this, for all those questions were dependent upon the first one, and when all of Dr. Morrow's answers are considered together they tend to show Ford's weak mental condition, and this might have been the controlling force with the jury in arriving at their verdict. Particularly forceful and material is Dr. Morrow's answer to the last question, where he gives it as his opinion that a man described as Ford was pictured in the question, while in a sanitarium for treatment for drug and liquor habits, would not be capable of transacting important business.

It is also earnestly insisted that the testimony is legally insufficient to sustain the verdict, but, inasmuch as the case is to be tried again upon possibly a different state of proof, we need not pass upon that question as it is presented by the testimony now in the record.

For the error indicated the judgment is reversed, and the cause remanded for a new trial.

KIRBY, J., dissents.