MARTIN *v.* MANNING, EMERSON & MORRIS.

Opinion delivered May 15, 1916.

1. APPEAL AND ERROR—CHANCERY CASE—INCOMPETENT TESTIMONY—PRACTICE.—On appeal, chancery causes are tried *de novo*, and this court will consider only competent testimony, although incompetent testimony was considered by the court below, and brought into the record before this court.

2. APPEAL AND ERROR—FINDING OF CHANCELLOR—CONTRACT.—On the issue of the existence of a contract, the finding of the chancellor will not be disturbed, when not against a preponderance of the evidence, although some incompetent testimony was admitted.

3. ATTORNEY'S FEES—CONTRACT WITH CLIENT—PROOF OF CONTRACT.—In an action by an attorney to collect certain fees, there was a contract made between the parties as to the amount to be paid the attorney. *Held,* the finding of the chancellor would not be disturbed on appeal.

4. ATTORNEY'S FEES—AMOUNT—FINDING OF CHANCELLOR.—The finding of the chancellor that appellees were entitled to fees of $5,000 for professional services, where appellant was relieved by their services from a liability of about $170,000, held correct.

5. FRAUDULENT CONVEYANCES—CONVEYANCES TO NEAR RELATIVES.—Transfers of property by an insolvent debtor, against whom suits for large amounts are pending, for a grossly inadequate consideration, are *prima facie* fraudulent, and the burden is upon the debtor to show the contrary.

Appeal from Arkansas Chancery Court; *John M. Elliott,* Chancellor; affirmed.

STATEMENT BY THE COURT.

This was a suit brought by the appellees against the appellants for legal services. The appellees alleged in their complaint that at the time they were employed

by the appellant J. H. Martin a judgment had been rendered against him for the sum of $28,000; that execution had issued and the sheriff had levied upon a large stock of goods and other property of appellant and same had been advertised for sale; that appellant, J. H. Martin, having been away from the county several weeks, was not advised at the time as to what other suits were pending against him; that he had been a director and stockholder in the Bank of Commerce and Trust Company, at Stuttgart, which was then in process of liquidation through the State Bank Commissioner; that it was agreed in consultation with the senior member of appellees' firm that appellees should represent appellant J. H. Martin in all these matters upon the basis of a retainer of $1,000, and that when all the matters involving appellant J. H. Martin's interests were terminated a reasonable fee should then be fixed for the services rendered by appellees; that in pursuance of the contract the senior member of appellees' firm immediately began the matter of representing appellant J. H. Martin in litigations which had been instituted in Arkansas. The complaint then alleged that in addition to the $28,000 judgment there was another suit pending against him for $139,797 and another for $3,900; that the senior member of appellees devoted practically his entire time during the month of December to the pending litigations against appellant J. H. Martin, and that as a result of his efforts appellant's property was released from the levy of the execution for $28,000, and that judgment satisfied, and that the other suits were adjusted and dismissed at the cost of the parties instituting the same; that appellant J. H. Martin was liable for all of the above sums, but as a result of the services of the appellees he was relieved from such liability, and that the services rendered by appellees to the appellant J. H. Martin were reasonably worth the sum of $5,000.

Appellees further alleged that the appellant J. H. Martin was insolvent and for the purpose of defrauding them and other creditors, had conveyed all of his real and personal property to his wife and brother. They

prayed that these conveyances be set aside, and that appellant J. H. Martin's property be subjected to the payment of such judgment as might be rendered in appellee's favor.

Appellees also had *lis pendens* notice filed in the recorder's office of Arkansas County.

The appellant J. H. Martin answered admitting that he had employed appellees to render him certain legal services, and that he had agreed to pay them the sum of $500, which he had done; that in consideration of such payment appellees agreed "that they would keep him (J. H. Martin) from signing a certain bond which this defendant had been asked and begged to sign, indemnifying any new corporation which might take over the assets and assume the liabilities of the Bank of Commerce and Trust Company."

The appellant J. H. Martin denied all other material allegations as to the employment of appellees and stated that the $500 was all the fee that they charged him or that he agreed to pay.

All of the appellants admitted the execution of certain instruments by which the appellant J. H. Martin conveyed to the other appellants, his co-defendants, certain property, but denied that they were made to defraud appellees or other creditors of appellant J. H. Martin; and they set up also that they were innocent purchasers for value.

These were the issues upon which evidence was adduced. The court found all the issues in favor of appellees and found that the appellant J. H. Martin was indebted to the appellees in the sum of $4,500, with interest amounting to $225, and rendered a decree in their favor for $4,725.

The court further found that certain conveyances made by the appellant J. H. Martin to the other appellants (describing the lands embraced in these conveyances) were without consideration and were fraudulent as to appellees, the creditors of J. H. Martin at the date of such conveyances, and entered a decree setting aside

these conveyances, and also found that the appellant
J. H. Martin had made a sale of his entire stock of goods,
wares and merchandise and certain other personal prop-
erty, without consideration, for the purpose of defraud-
ing· the appellees and other creditors in the collection of
their debts, and entered a decree setting these aside.

Such other facts as may be necessary will be stated
in the opinion.

*Thos. J. Moher,* for appellant.

1.  The amount rendered in favor of appellees by
the chancellor is decidedly against the preponderance of
the testimony as to the value of the services and labor
performed. *Sain* v. *Bogle,* 122 Ark. —; 4 Elliott on Cont.,
§ 2866; 106 Ark. 571; 20 A. & E. Ann. Cas. 53. The fee
allowed is unreasonable.

2.  The burden to establish a contract was upon ap-
pellees. 93 Ark. 312.

3.  No fraudulent transfer was proven, nor was in-
solvency shown. Kirby's Digest, § 3313; 66 Ark. 486; 56
*Id.* 481; 63 *Id.* 416; 20 Cyc. 465-6-7-8, etc., section B; 2
Moore on Fraud. Conveyances, 577; 18 Ark. 124; 23 *Id.*
264; 17 *Id.* 152. No participation in the alleged fraud
by the other appellants was shown.

*Murphy & McHaney,* for appellees.

1.  The contract was made as claimed by appellees.
The fee was reasonable for the services performed.

2.  The conveyances were fraudulent. Kirby's Dig.,
§ 6137. Insolvency was not denied. 108 Ark. 164-9;
Wait on Fraud. Conv., § 231, 20 Cyc. 407-8, 754; Kirby's
Digest, § 3658; 101 Ark. 573; 106 *Id.* 230; 110 *Id.* 335;
107 *Id.* 581; 50 *Id.* 314; 55 *Id.* 579; 59 *Id.* 614-624; 86 *Id.*
225; 91 *Id.* 394; 73 *Id.* 174-183; 68 *Id.* 162-7. The find-
ings of the chancellor are sustained by the evidence.

WOOD, J., (after stating the facts). The issues in-
volved on this appeal are principally of fact.

The first question is, what was the contract between
the appellant J. H. Martin and the appellees as to the

character of the employment and the consideration for the legal services that appellees rendered Martin.

Appellant J. H. Martin admits that he was to pay appellees the sum of $500, which he says he had paid. The appellees admitted that appellant had paid them the sum of $500, but they contend that this sum was paid by appellant only as a part of a retainer of $1,000 charged by appellees when they were first employed by appellant and that the balance of their fee was to be determined upon a *quantum meruit,* the amount depending upon the labor connected with and the results of the litigation to the appellant J. H. Martin.

M. J. Manning, the senior member of appellees' firm, with whom appellant J. H. Martin entered into the contract, testified substantially as follows: That while he was attending court at Clarendon in December, 1914, J. H. Martin came over there to see him and stated to him that he did not know what suits had been brought against him (Martin), but that he had been told that he had been sued by the Bank Commissioner; that he did not know the nature of the suit nor the amount involved; that he had also been sued by the prosecuting attorney for county funds of Arkansas County, and that judgment had been rendered against him for the sum of $28,000, and that his stock of goods had been levied upon at Gillett. Upon asking what appellees' firm would charge for their services the witness stated that they would charge a retainer of $1,000, and that when the matters were ended they would make a reasonable charge, depending upon the amount of services and the results obtained. Whereupon Martin stated that he had been away from home for several weeks and that the boys running his business had drawn checks and that he did not know the exact condition of his bank account, and that he would therefore give a check for $500 of the retainer and pay the other within a short time. Witness told Martin that this was satisfactory and that he could pay the other $500 of the retainer about January 1 unless his matters had been disposed of before that time. Martin readily consented to this agree-

ment and gave the check for $500. Immediately after Martin left, witness went into another room of their office, gave the check to his partner, Mr. Emerson, told him of the contract he had made with Martin, and this was within a minute or two after the final arrangement had been made with Martin.

Witness then testified in detail as to the services rendered the appellant Martin, stating that he went to Stuttgart on the next train, found that Martin, as one of the stockholders of the Bank of Commerce & Trust Company, had been sued for over $139,000, in addition to the $28,000 judgment that had been rendered against him on which execution had been issued and his stock of goods and personal property levied upon. Witness then testified as to the services rendered by which he succeeded in having the sheriff release the personal property, consisting of the stock of goods, stock, etc., and to levy upon certain lands, all of which were greatly desired by and to the interest of Martin.

The testimony of Manning shows that it was the purpose of the directors and stockholders of the Bank of Commerce & Trust Company to make an arrangement satisfactory to the Bank Commissioner and the depositors and creditors of the Bank of Commerce & Trust Company by which a new bank could be organized to take over the assets of the Bank of Commerce & Trust Company and pay its debts and collect and dispose of its assets. The Bank Commissioner had all of its assets appraised and ascertained that it would take at least $90,000 to pay the debts after collecting all the assets. He shows that other directors and stockholders had arranged to execute a bond in the sum of $90,000 to secure the payment of the indebtedness of the Bank of Commerce & Trust Company, and that the other directors had executed mortgages upon their properties, which had been appraised at the sum of $250,000, to secure the bond. The witness details how he made an arrangement with the other directors and the Bank Commissioner by which if Martin signed the bond he was to be only secondarily

liable, and he inserted a provision in the bond to the effect that no steps were to be taken to collect any of the sums due for eighteen months, and that Martin should not be liable until the property of the other bondsmen had been exhausted. Witness talked with his client and advised him fully as to the arrangement, telling him that he did not believe he could escape liability as a director or stockholder. The appellant then had some little changes made in the bond, signed it and sent it to witness at Stuttgart with directions to witness to deliver it after the $28,000 judgment had been satisfied and the other suits dismissed. Witness stated that the sole purpose of the services rendered his client was to have him relieved of the judgment and the suits pending against him. Witness spent practically his entire time from December 4 to the date when the new bank was organized, in appellant's interest, and about the matters for which Martin had employed him.

Witness shows that the Bank Commissioner refused to accept the bond without Martin's signature to it, and that witness, on behalf of Martin, insisted that Martin would not sign the bond unless the other directors were made primarily liable, and he succeeded in having the bond so framed that the other directors would be primarily liable, and had deeds of trust executed by them on property sufficient to cover the face of the bonds, and that through his efforts the judgment against Martin for $28,000 was satisfied and the other suits, which if the arrangement had not been made might have resulted in judgments against him for the sums of $139,000 and $3,900, were dismissed.

Witness Emerson, a member of the firm of appellees, testified that he was at Clarendon attending court when Martin came to employ his firm, through Mr. Manning. Martin and Manning had a long consultation in one of the rooms of the office. Witness passed through during the conversation. After the consultation between Manning and Martin they both came out of the room in which the consultation was held into the room where wit-

ness was engaged. Martin passed on through and Manning stopped at witness' desk and handed witness Martin's check for $500 and stated that: "we had been employed upon terms of a retainer of $1,000 and the balance of the fee to be fixed at a reasonable sum based upon the services rendered and the results procured," and upon witness' return home (to Little Rock) witness had Martin charged on the books with a retainer of $1,000 and credited him with the check for $500. Mr. Manning devoted practically the entire month of December to Martin's affairs.

Martin testified concerning this employment substantially as follows: He met Manning at Clarendon. He went to Clarendon on December 4, 1914, to employ Manning in reference to a particular legal matter and met Manning in the back room of his office; that there was no one present but Manning and witness. The Stuttgart people, stockholders and other parties, wanted the witness to sign the bond. It was a bond to be signed by the directors of the Bank of Commerce & Trust Company guaranteeing the sum of about $90,000. Witness understood that if he signed the bond that the stockholders would not be sued by the depositors and the new bank would be opened and the judgment would be satisfied. The bond was to indemnify a new bank in taking over all the assets of the old bank. Witness had talked with Mr. Covey, the deputy bank commissioner, and several others before he went to Mr. Manning. Witness told them that he did not want to sign the bond. Mr. Covey stated that if witness would sign the bond the bank would get a charter and the judgment would be satisfied. Witness told him that he did not want to sign the bond. That was three or four days before he went to see Mr. Manning. When he went to see Mr. Manning the main thing he employed Manning to do was to keep witness from signing the bond. Manning told witness that he would not have to sign the bond. Witness and Manning talked about the fee and Manning told witness that the parties at Stuttgart had employed him for 10 per cent. on the stock, and

Manning said that he would charge witness a little more than that. Witness had something near $4,000 in the Bank of Commerce & Trust Company. Manning said he would charge witness $1,000. Witness put his check book in his pocket and started to leave the office, stating to Manning that he would not pay it. Manning then asked witness what he would pay. Witness replied that he would cut it in two and make it $500. Manning said "write your check." Witness wrote the check, handed it to Manning and stated to him, "This is to keep me from signing the bond." Witness stated that they were engaged in the conversation with reference to this employment from five to eight minutes.

Witness met Manning the next morning in a private room at the hotel, and the first thing Manning told witness was that witness would have to sign the bond. Witness replied that he did not want to do it, and recalled his conversation of the previous day, telling Manning that he had paid him to keep witness from signing the bond, whereupon Manning stated that he would make the bond so that witness would be only secondarily liable. Witness did not have any written contract with Mr. Manning with reference to his employment.

Witness then stated that an execution had been levied upon his property and that he had not heard of any execution being levied upon the property of the other defendants in the judgment for $28,000.

Witness then proceeds in detail to deny the testimony of the appellee Manning as to the services rendered in regard to the releasing of his property from the execution, stating that he himself induced the sheriff to release his personal property and levy on the land. In this connection he stated that Manning was in the sheriff's office while witness was getting the list of property from the clerk. Witness stated that it was understood that if he signed the bond they would release all the other stockholders and also the directors of both civil and criminal liability; that the deputy bank commissioner told witness that if he signed the bond the bank would get a charter

and the judgment would be satisfied. Witness stated that he could sign the bond without the services of an attorney; that Mr. Manning was representing the other stockholders. He was representing the Underwoods, who were directors, in the criminal line. They were afraid the grand jury would indict them and also afraid the depositors would sue them, and by witness signing the bond that would release all of them and the new bank would go ahead, and that would expedite matters for Mr. Manning. Witness finally signed the bond, and the bank was opened and the Underwoods were not indicted for criminal liability, and the other judgments against witness were released. Witness changed the bond. After that Manning wrote witness to send him a check for $3,500, threatening that if witness did not do so he would bring suit.

On cross-examination witness was asked whether Manning, on the morning of the 5th of December, showed witness a memorandum as to the value of certain real estate which the other directors of the Bank of Commerce & Trust Company would be required to give a deed of trust upon, which amounted to $250,000. Witness answered, "It sure got to me somewhere, but to say where it was I could not say." He was then asked if it was not explained by Mr. Manning in that conversation that the other directors would be required by Mr. Manning to give a deed of trust upon real estate which would not be less in value than the amount above stated, which would be subject to the payment of the bond, together with any other property the directors might have, before any liability should attach to witness as a signer of the bond, and he answered that he did not remember any such conversation, but he did remember that Mr. Manning stated that he would make the bond so that witness would be only secondarily liable. Witness further stated that Mr. Covey and the other directors of the Bank of Commerce & Trust Company had asked the witness if he would sign the bond, and witness stated that he refused to sign it until he could see Mr. Manning, and that when he saw

Mr. Manning he said he would make the bond so that witness would be only secondarily liable. Witness further stated that he consented to sign the bond if Manning would draw it so that witness would be liable only secondarily.

(1)    Appellant moved in the court below to strike out the testimony of Emerson, which motion the court overruled, and appellant now contends that this testimony should be stricken from the record as hearsay. Chancery causes are tried here *de novo*, and the rule here is to consider only competent testimony, no matter if incompetent testimony was considered by the court below and brought into the record before this court.

(2)    That part of the testimony of Emerson concerning the statements of Manning made to him in the absence of Martin and after Martin had left the office were but the recitals of past transactions and therefore hearsay testimony. This testimony was not competent as a part of the *res gestae*. That part of Emerson's testimony to the effect that Martin and Manning had a long consultation in the office on the day Martin employed appellees corroborates Manning in this particular and was competent. But even excluding that part of the testimony of Emerson that was incompetent as to these statements of Manning, from our consideration, it can not be said that the finding of the chancellor is clearly against the preponderance of the evidence. On the contrary, when all the facts and circumstances as discovered by the testimony both on the part of appellant J. H. Martin and appellee Manning are considered, it appears to us that the preponderance is in favor of the appellees.

The undisputed testimony shows that at the time of the contract between Manning and Martin a judgment had been rendered against Martin and other directors of the Bank of Commerce & Trust Company for the sum of $28,000 for public funds deposited in the bank. The bank was also in process of liquidation by the State Bank Commissioner. He had instituted suit against Martin and other directors for the sum of $139,797.26. He had also

instituted suit against Martin individually for the sum of $3,900 under what is known as the "double stock liability law."

It appears that the stockholders of the bank were proposing to organize a new bank to take over all the assets of the old bank and assume its liabilities. This had met the approval of the Bank Commissioner upon certain conditions, one of them being that the directors of the old bank should execute a bond in the sum of $90,000, guaranteeing that the assets of the old bank would realize that sum. The Bank Commissioner had told Martin that if he would sign the bond the bank would get a new charter, and that the judgment for $28,000 would be satisfied. Appellant Martin testified that it was "to keep him from signing this bond" that he employed the appellees, and he states that he was to pay them $500 for their services, which it is admitted had been paid.

The uncontroverted testimony shows that at the time of the employment Martin knew that the judgment had been rendered against him for $28,000, and that his stock of goods and other personal property had been levied upon. Martin testified that he did not know of other suits pending against him, while Manning testified that Martin stated to him at the time that he had learned that other suits had been brought but he did not know the nature of these suits or the amounts involved.

While the testimony does not clearly reveal the reason why Martin did not wish to sign the bond along with the other directors, it is fairly inferable that he was contending that, inasmuch as he had not been in attendance on the stockholders and directors meetings and had taken no part in the active management of the affairs of the bank, that the other directors alone were liable, and therefore he was unwilling to sign the bond. He testified in one place that the main thing he employed Manning to do was to keep him from signing the bond; that when he handed him the check for $500 he stated, "this is to keep me from signing the bond," that he was only engaged in the conversation with Manning from five to eight minutes.

In another place he stated that he could have signed the bond without the services of an attorney. In another place in his testimony he stated that he consented to sign the bond, and did sign it, after Manning promised him that he would draw the bond so that witness would be only liable secondarily.

(3)   While the testimony of Martin is confused and unintelligible if taken literally in reference to his conduct in signing the bond, we conclude that the meaning of the witness was that he employed Manning to represent him in connection with the affairs of the bank in such way that he would not be made liable along with the other directors and stockholders on the judgment that had been rendered or any judgments that might be rendered against them. This, we think, is the only reasonable conclusion that can be drawn from his testimony, and if it does not mean this it is nonsensical, for it is manifest that so far as the mere signing or not signing of the bond was concerned Martin did not need the services of a lawyer. It appears that what he did really need was the services of an attorney to represent and protect his interests as a stockholder and director in litigation that had been and might be brought against him as such. If his testimony is to have any meaning at all, in its final analysis, this is the only effect that can be given it, and when thus considered it but accords with the testimony of Manning as to the character of the services he was employed to render Martin. Manning's testimony was to the effect that Martin employed appellees to represent him in the $28,000 suit in which judgment had already been rendered against him and in all matters affecting his interests as director and stockholder in the bank in any suits that had been brought against him; that a retainer was fixed for this service in the sum of $1,000, and the full fee was to be charged after the service had been rendered, the amount to be determined after considering the nature of the services and the results thereof.

Inasmuch as the testimony of both Manning and Martin shows that a judgment of $28,000 had already

been rendered against Martin and that he was anticipating other suits in which judgments involving large amounts might be rendered against him, it appears to us more reasonable to say that the attorneys would not have agreed in advance upon a fee of only $500 as full compensation for the services that appellees would be required to render, especially if those services contemplated that the attorneys should conduct Martin's affairs as director and stockholder in the bank in such a way as to relieve him of any liability as such director and stockholder in the suits that were pending against him.

Manning's testimony is consistent and reasonable and, to our minds, more believable than Martin's as to the work to be performed by appellees and the consideration to be paid therefor.

(4) The next question is, what was the reasonable value of the services performed?

Martin testified that he employed Manning to keep him from signing a bond in the sum of $90,000 to be signed by the directors of the bank. If, as we have seen, Martin meant by this that he employed Manning to represent him in pending and threatening litigation in connection with the affairs of the bank in such a way that he would not be liable as stockholder and director for the claims that had been asserted against him, then the results show that Manning faithfully performed his contract.

The undisputed evidence shows that the Bank Commissioner would not accept the bond for $90,000 unless Martin signed the same. Martin stated that he refused to sign the bond until Manning said that he would so frame it that he (Martin) would be liable only secondarily.

Manning's testimony shows that he framed the bond so as to make the appellant liable only secondarily, and that through his efforts deeds of trust or mortgages were taken on property of the other directors appraised at $250,000, which was amply sufficient to pay in full the face value of the bond, thus relieving Martin of any lia-

bility; that after this was done Martin, after making a few immaterial changes, executed the bond, and the judgment for $28,000 was paid off and satisfied and the other suits dismissed, thus relieving Martin of liability in judgments and suits pending against him in the sum of about $170,000 for which he might have been liable. As a result of the efforts of Manning in this behalf his stock of goods and lands that had been levied upon and advertised for sale to satisfy the judgment for $28,000 were released from the levy.

Manning testified that the services rendered by him covered practically his entire time from December 4 to December 29; that the services were really worth more than $5,000. In addition to Manning's testimony as to the value of the services, several attorneys of long experience and good repute were introduced and were asked if they had read a copy of the complaint in the case, and having answered in the affirmative, they were further asked as to what would be a fair and reasonable fee for the services rendered as set forth in the complaint in the case, and they answered that $5,000 would be a reasonable fee. Two of these testified to facts showing that they had personal knowledge of the services rendered by Manning, and that $5,000 would be the minimum fee for such services as were set forth in the complaint.

Appellants contend that the testimony of these experts was incompetent because the hypothetical question upon which the opinion was based did not embrace undisputed facts that were essential to the issue, relying upon the well settled doctrine of this court that hypothetical questions must embrace all the undisputed facts that are essential to the issue about which the expert is testifying, citing *Taylor* v. *McClintock,* 87 Ark. 243; *Mo. & North Ark. Rd.* v. *Daniels.* 98 Ark. 352; *Arkansas Midland R. Co.* v. *Pearson.* 98 Ark. 399; *Ford* v. *Ford,* 100 Ark. 518: *Williams* v. *Fulkes,* 103 Ark. 196.

Appellant does not abstract any testimony that tends to prove that Manning did not perform the services as alleged in the complaint. The testimony of Manning and

other witnesses who were personally familiar with the matters set forth shows that the services were rendered in the manner indicated.

The finding of the chancellor that the services rendered were reasonably worth $5,000 is therefore correct.

(5)  The last question is whether or not the transfers of personal property and conveyances of real estate by appellant J. H. Martin to his wife and brother were with the intent to defraud creditors.

The appellee alleged that J. H. Martin was insolvent at the time of these transfers and conveyances and this allegation is not denied. The transfers and conveyances were made to near relatives and the consideration named in the deeds was one dollar and other valuable consideration. At the time these transfers and conveyances were made suits were pending against appellant J. H. Martin for large amounts. It thus appears that while J. H. Martin was insolvent and when suits for large amounts were pending against him he made transfers and conveyances to his near relatives which upon their face show grossly inadequate consideration. The proof of these facts was sufficient to show that the conveyances and transfers were *prima facie* fraudulent, and the burden was cast upon the appellants to show to the contrary.

As was said in *Simon* v. *Reynolds-Davis Grocery Co.*, 108 Ark. 164-9: "While the burden of proof is upon the plaintiff who alleges fraud to show it, yet that burden has been discharged where, as in this case, he shows that an embarrassed debtor, pending a suit against him by his creditors, has made conveyances of all the land he owned, * * * to his sons for a consideration which upon the face of the conveyance appears to be a grossly inadequate one. Such circumstances are sufficient to raise a suspicion of fraud and to cast a doubt upon the legality of the transaction; and the burden is then on the one holding under the deed to show a consideration." *Buchanan* v. *Williams*, 110 Ark. 335; *Papan* v. *Nahay*, 106 Ark. 230.

The court was therefore correct in its finding that the conveyances were fraudulent. The decree is in all things correct, and it is therefore affirmed.

KIRBY, J., dissenting.